IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| FRED FULTON FRALICK, | § | |
| | § | |
|     Plaintiff- | § | |
|     counterdefendant, | § | |
| | § | Civil Action No. 3:09-CV-0752-D |
| VS. | § | |
| | § | |
| PLUMBERS AND PIPEFITTERS | § | |
| NATIONAL PENSION FUND, | § | |
| | § | |
|     Defendant- | § | |
|     counterplaintiff. | § | |

MEMORANDUM OPINION
AND ORDER

In this civil action seeking benefits under an ERISA[1] pension benefit plan, the court must decide whether the plan trustees abused their discretion in concluding that the plaintiff-beneficiary was precluded from receiving early retirement benefits because he was engaged in disqualifying employment under the plan.

I

Plaintiff-counterdefendant Fred Fralick ("Fralick") sues defendant-counterplaintiff Plumbers and Pipefitters National Pension Fund (the "Fund") under ERISA § 502, seeking retirement benefits and cessation of the Fund's collection efforts for money previously paid. The Fund counterclaims to recover sums paid to Fralick. The suit arises from a dispute over Fralick's entitlement to retirement benefits under the terms of the Fund's Plan of

_____

[1]Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001-1461.

Benefits (the "Plan").

Fralick is currently 61 years old and has worked for most of his life in the plumbing industry.[2]  During most of that time, he was a member of the United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry (the "Union") and its local 100.  Fralick worked for various employers who, under the terms of the applicable collective bargaining agreement, made contributions on his behalf to the Fund.  The Fund is a defined benefit multi-employer pension fund that accepts payments from employers (referred to as "contributing employers"), in exchange for a promise to later pay pension benefits to individual employees according to the terms of the Plan.

The Plan contains several relevant provisions that relate to retirement and post-retirement employment by beneficiaries.  Under the Plan, normal retirement age is generally age 65.  Plan participants can take early retirement, but early retirement pension benefits are available only if a participant is retired.

---

[2]Because the court is considering both Fralick's motion for judgment on the pleadings and the Fund's motion for summary judgment, this memorandum opinion and order will recite primarily the facts that are uncontested.  If a contested fact is relevant to the court's analysis of a particular motion, the court will view the evidence in the light most favorable to the nonmoving party. *See, e.g., Owens v. Mercedes-Benz USA, LLC*, 2008 WL 3152966, at *1 (N.D. Tex. Aug. 6, 2008) (Fitzwater, C.J.) (stating Fed. R. Civ. P. 12(c) standards); *AMX Corp. v. Pilote Films*, 2007 WL 1695120, at *1 n.2 (N.D. Tex. June 5, 2007) (Fitzwater, J.) (stating Rule 56 standards).  If a contested fact issue is relevant to the analysis of both motions, the court will note the disagreement.

"To be considered 'Retired,' a Participant must have separated from service with any and all Contributing Employers and from any and all employment that would be considered to be Disqualifying Employment[.]"   D. App. 26.   In the context of this case, "disqualifying employment" includes, *inter alia*, (1) "Employment with any Contributing Employer," (2) "Employment with any employer in the same or related business as any Contributing Employer," or (3) "Employment or self-employment in any business which is under the jurisdiction of the Union."   *Id*. at 27.[3]   Engaging in disqualifying employment merits a six-month suspension of benefits after the conflicting work ceases, with an additional six-month term possible if the beneficiary failed to notify the Fund of the disqualifying employment or wilfully misrepresented facts.   Both six-month periods are waivable at the discretion of the Fund's Board of Trustees.

In 2005, before this litigation, Fralick worked for Brandt Engineering, a contributing employer engaged in mechanical engineering.   Both parties agree that this work falls within the plumbing and pipefitting industry.   Fralick, who was 57 years old at the time, contacted Robert Cooke ("Cooke"), an employee of the Union.   Fralick asked Cooke about the option of taking early

---

[3]Under the Plan, "the Union" means the United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada and its affiliated Local Unions and District Councils.   D. App. 19.

retirement.  He inquired about whether he could begin receiving pension payments if he retired in 2005 from Brandt Engineering, even if he subsequently went to work for an electrical engineering company.  Cooke informed Fralick that performing work as an electrical engineer would not endanger his entitlement to pension benefits.  Because electrical engineering work is distinct from mechanical engineering work, Fralick's electrical engineering employment would not disqualify him from being "retired" from the plumbing and pipefitting business.  Neither Fralick nor the Fund disputes this conclusion in principle.

Fralick concluded his employment with Brandt Engineering in December 2005.  He was awarded early retirement benefits and received monthly payments for the majority of 2006.  Beginning in January 2006, Fralick began working for Brandt Electric, a legally distinct sister company to Brandt Engineering.  The two companies apparently share the same corporate hierarchy, advertise through the same website, and have their headquarters offices at the same Dallas location, although they are legally distinct and perform different services.  The part of the company website that pertains to "Electrical Services" states that "Brandt Electric was organized in August 2001, with a goal to expand our services to our key customers[.]" D. App. 84. Brandt Electric's contact email address is "electricalinfo@brandteng.com." *Id.*  Brandt Engineering is apparently the older of the two companies.

In November 2006 the Fund received notice from the business manager of a Union local that Fralick was employed by Brandt Engineering (not Brandt Electric).  The Fund informed Fralick that this was "disqualifying employment," that he was not entitled to Plan benefits, and that the Fund was suspending payment of benefits.  It requested that he return the money it had distributed in 2006.  Fralick appealed the decision, arguing that he was employed by Brandt Electric——not Brandt Engineering——and that Brandt Electric did not engage in any business covered by the Union that could trigger the disqualifying employment sanctions.  The Fund affirmed its initial decision.

Fralick filed this lawsuit seeking unpaid retirement benefits and cessation of the Fund's attempts to recoup benefits it had paid before it learned of his employment by Brandt Electric.  Fralick alleges claims for benefits and equitable estoppel, and he seeks an award of attorney's fees.[4]  The Fund counterclaims to recover sums previously paid to Fralick.  Fralick moves for judgment on the pleadings, and the Fund moves for summary judgment.  Fralick also moves to strike the Fund's motion for summary judgment and its response and appendixes to Fralick's motion for judgment on the pleadings.

---

[4]Fralick initially brought a claim for breach of fiduciary duty, but this count was later dismissed on the Fund's unopposed motion.

II

The court turns first to Fralick's two motions to strike, which are addressed to the Fund's response brief to Fralick's motion for judgment on the pleadings and the Fund's motion for summary judgment.  The court must address these motions as a threshold matter because they bear on the scope of the evidence that is properly considered in evaluating the merits of the motions for summary judgment and for judgment on the pleadings.  Fralick maintains that these filings must be stricken because they are both based largely on evidence that the court is not permitted to consider in reviewing the Fund's decision to terminate his pension benefits.  The Fund opposes Fralick's motions, contending that the evidence is admissible for relevant purposes.

A

As a preliminary matter, the Fund asserts that Fralick's motions to strike are procedurally misplaced, arguing that neither the Fund's motion for summary judgment nor its response to Fralick's motion for judgment on the pleadings are pleadings to which Fed. R. Civ. P. 12(f) applies.  The Fund also argues that Fralick has not identified any procedural basis for striking the filings.

The Fifth Circuit has endorsed the use of a motion to strike to challenge evidence supporting or opposing a motion for summary judgment.  *See Metro. Life Ins. Co. v. Daftary*, 2004 WL 1960101, at

*3 n.4 (N.D. Tex. Sept. 3, 2004) (Fitzwater, J.) ("The correct procedure is to file a motion to strike when evidence submitted in support of or opposition to summary judgment is inadmissible." (citing *Auto Drive-Away Co. of Hialeah v. Interstate Commerce Comm'n*, 360 F.2d 446, 448-49 (5th Cir. 1966))).   The court can discern no reason not to apply this procedure when evidence is offered in support of or in opposition to a motion for judgment on the pleadings.

Although Fralick's motions to strike are not procedurally misplaced, the court is not aware of any basis to strike the Fund's filings in their entirety——as Fralick requests——as opposed to striking the inadmissible components.   Accordingly, the court will consider only whether the particular evidence in question should be stricken rather than whether the filings should be stricken in their entirety.

B

As the court explains below, it reviews the Fund's denial of Fralick's benefits claim under an abuse of discretion standard. Subject to limited exceptions, that review is conducted on the administrative record.   *See Griffin v. Raytheon Co. Long Term Disability Plan No. 558*, 2005 WL 4891214, at *2 (N.D. Tex. Aug. 31, 2005) (Fitzwater, J.) ("With limited exceptions, this court's review of [the Plan's] decision in this ERISA case is restricted to consideration of the administrative record." (citing *Vega v. Nat'l*

- 7 -

*Life Ins. Servs., Inc.*, 188 F.3d 287, 299 (5th Cir. 1999) (en banc))). Fralick's motions to strike require that the court determine what evidence it may consider in addressing Fralick's claims. Fralick asserts that the Fund's submissions rely on inadmissible evidence from outside the administrative record. The Fund responds that the disputed evidence falls within exceptions to the administrative-record limitation and is admissible.

The most important piece of evidence that is the subject of Fralick's motions to strike is his deposition testimony. The Fund took the deposition for this litigation, and it cites the transcript repeatedly in its summary judgment motion and its response to Fralick's motion for judgment on the pleadings. Moreover, the deposition testimony is the primary source of evidence supporting one of the Fund's principal arguments. The court will therefore analyze first whether it can consider this testimony and then turn to the other evidence at issue.

To place Fralick's motions to strike in proper context, the court must analyze the grounds that the Fund has advanced for denying Plan benefits. The Fund appears to have originally maintained that Fralick was an employee of Brandt Engineering, a contributing employer, and therefore ineligible for benefits. The Fund asserted that it initially became aware that Fralick was possibly disqualified from receiving Plan benefits when it received a letter from the business manager of a Union local that stated

that Fralick "is currently employed by Brandt Engineering." D. App. 58. Apparently based largely, if not entirely, on this communication, the Fund notified Fralick by December 6, 2006 letter that it had "received notification that you are currently working at the [plumbing and pipefitting] trade with Brandt Engineering in Austin, TX." *Id.* at 59. Consequently, it suspended benefits effective January 1, 2007. It therefore appears to the court, and is not disputed by either party, that the Fund originally based its disqualification decision on the assumption that Fralick was an employee of Brandt Engineering (as opposed to Brandt Electric).

The second theory on which the Fund relied was that Brandt Electric was an employer in the same or related business as any contributing employer, i.e., that Brandt Electric engaged in work of a type that was performed by contributing employers. Fralick notified the Fund that he was employed by Brandt Electric in its Computer Aided Design ("CAD") department and in document control. The Fund responded that this

> work would be a violation of [the Plan], in that such work is for any employer in a related business as a Contributing Employer since the electrical contracting company would be having these individuals perform mechanical CAD work, which is work done by Contributing Employers to [the Fund], and thus work that is done by an employer in the same or related business.

*Id.* at 61.

Fralick appealed again, arguing that "Brandt Electric has

- 9 -

never requested that I do any mechanical drawings, since they do no mechanical work, or any other work, that is related to the Plumbing and Pipefitting industry." *Id.* at 65.   In addition, Fralick submitted a letter from Brandt Electric's president that stated: "Brandt Electric is an Electrical Contractor.   We are a completely separate company from Brandt Engineering.   We do no Plumbing, Pipefitting, or Mechanical work.   We have our own detailing department and they do only electrical drawings." *Id.* at 69.

In response to these communications, the Fund sent a third letter to Fralick rejecting his arguments.   Here, the basis for the Fund's decision to deny benefits appears to have shifted again. The Fund denied his appeal on the basis that "Brandt Electric is a sister company to Brandt Engineering.   Brandt Engineering is a [Contributing Employer].   You are employed by Brandt Electric, which is Disqualifying Employment since such work is for an employer in a related business as a Contributing Employer." *Id.* at 70.   The Fund relied on this same reasoning in subsequent letters that it sent to Fralick after he retained counsel and submitted additional evidence about his employment with Brandt Electric.

In its submissions in this case, the Fund has raised a new argument to justify its decision, and it draws the supporting evidence primarily from Fralick's deposition testimony. Essentially, the Fund asserts that, although Fralick may have been employed by Brandt Electric, he actually continued to work for

Brandt Mechanical.  The Fund characterizes Fralick's arrangement with Brandt Electric as "sham employment," and points to deposition testimony showing that Fralick was supervised by Brandt Engineering employees, was assigned work by Brandt Engineering on job sites where Brandt Electric was not involved, performed work that was covered by the Union (and which did not benefit Brandt Electric), and was unfamiliar with the employees and management of Brandt Electric.  The Fund maintains that, although Fralick may have been on Brandt Electric's payroll, his testimony shows that he actually performed work for, and under the supervision of, Brandt Engineering.  The Fund posits that, because the Plan's understanding of disqualifying employment is broad enough to encompass this situation and is not limited simply to being on the payroll of a contributing employer, Fralick's services for Brandt Engineering demonstrate that he was not "retired" under the Plan.

C

This last argument—that Fralick's employment for Brandt Electric was a "sham"—is supported almost entirely by Fralick's deposition testimony.  The Fund has pointed to no evidence, and the court has located none, that the plan trustees relied on or even considered this justification when they made the initial decision or denied Fralick's appeals.  To the contrary, the only reason the Fund cited in its letters following Fralick's appeals is that the two Brandt companies were related to one another and that his

employment for Brandt Electric was "for an employer in a related business as a Contributing Employer." D. App. 85. There is no mention of Fralick's actual employment responsibilities or indication that the Fund believed that he was being less than forthright in his statements regarding his work. Thus the sham employment argument appears to have been advanced for the first time in this litigation, and it is supported almost entirely by Fralick's deposition testimony.[5] The court will therefore examine whether it is permissible for the parties to rely on, and for the court to consider, the deposition testimony in adjudicating the merits of Fralick's claims.

"A long line of Fifth Circuit Cases stands for the proposition that, when assessing factual questions, the district court is constrained to the evidence before the plan administrator." *Vega*, 188 F.3d at 299. "[T]he district court is precluded from receiving evidence to resolve disputed material facts——i.e., a fact the administrator relied on to resolve the merits of the claim itself." *Id*. "[T]he administrative record consists of relevant information made available to the administrator prior to the complainant's filing of a lawsuit and in a manner that gives the administrator a

---

[5]The Fund also points to the letter from the business manager of the Union local as evidence that Fralick was engaged in sham employment. But there is no indication in the record that the Plan administrators ever considered such an argument prior to this litigation. Furthermore, the letter alone, without the deposition evidence, is insufficient to support the Fund's argument.

fair opportunity to consider it." *Id.* at 300. "It is the plan administrator's responsibility to compile a record that he is satisfied is sufficient for his decision." *Griffin*, 2005 WL 4891214, at *2 (alteration omitted) (citing *Barhan v. Ry-Ron Inc.*, 121 F.3d 198, 201 (5th Cir. 1997)).

"Once the administrative record has been determined, the district court may not stray from it except for certain limited exceptions." *Angel v. Boeing Co. Retiree Health & Welfare Benefit Plan*, 2006 WL 929364, at *6 (N.D. Tex. Apr. 11, 2006) (Fitzwater, J.) (quoting *Vega*, 188 F.3d at 299). Such exceptions include "evidence of 'how an administrator has interpreted terms of the plan in other instances, and evidence, including expert opinion, that assists the district court in understanding the medical terminology or practice related to a claim.'" *Griffin*, 2005 WL 4891214, at *2 (quoting *Estate of Bratton v. Nat'l Union Fire Ins. Co.*, 215 F.3d 516, 521 (5th Cir. 2000)). A litigant cannot "disregard the evidence before the administrator and relitigate in court the historical facts surrounding a claim." *Wildbur v. ARCO Chem. Co.*, 974 F.2d 631, 639 (5th Cir. 1992). Fifth Circuit precedent "would support a decision by a district court conducting an abuse of discretion review to limit its review of the historical facts underlying a claim to those presented to the plan administrator[.]" *Id.* at 642.

The court concludes that no exception permits the Fund to rely

on Fralick's deposition testimony to establish a factual proposition concerning the nature of Fralick's work while employed by Brandt Electric.   The Fund has not demonstrated that its reliance on Fralick's deposition testimony falls into one of the exceptions.   Indeed, because the testimony is the only apparent evidentiary basis for the Fund's sham employment argument, the Fund's reliance clearly relates to the historical facts underlying Fralick's claim.   The court cannot look beyond the administrative record to determine historical facts, and the nature of Fralick's work while employed by Brandt Electric falls into this category. The court therefore holds that the deposition is inadmissible. Because there is no basis in the administrative record to support this reason for the Fund's initial decision or for denying Fralick's appeals, the court rejects the Fund's argument that the trustees did not abuse their discretion because Fralick was engaged in sham employment.

D

Fralick also moves to strike the Fund's motion for summary judgment and response to Fralick's motion for judgment on the pleadings in their entirety, contending that they contain numerous references to inadmissible evidence.   Fralick concedes, however, that some of the evidence is likely part of the administrative record.   And he fails even to attempt to distinguish inadmissible from admissible evidence, complaining in each motion that "[i]t

would be burdensome for Plaintiff to attempt to determine which documents, if any, in the Appendix are part of the administrative record." P. Jan. 7, 2010 Mot. Strike 3; P. Jan. 26, 2010 Mot. Strike 3. Although the court would probably not abuse its discretion by declining to consider Fralick's motions in the absence of greater specificity, it has instead generally reviewed the evidence that Fralick challenges.

The court holds that this evidence, including that contained in the appendixes, is admissible. Much of the evidence is composed of pre-lawsuit letters and correspondence between the Fund and Fralick, duplicating and augmenting the attachments to Fralick's complaint. Other items include relevant portions of the Plan, Internet printouts from the website of Brandt Engineering and Brandt Electric, and affidavits of Fund employees. These all appear to be materials that would have been available to the Fund when it made its determinations and therefore part of the historical record. Some of the evidence and appendixes are composed of information about other benefits cases decided by the Fund but not directly related to Fralick's case. The Fund argues that these materials are relevant because they fall into an established exception to the administrative record limitation: evidence of how the Fund has applied the Plan in other cases, to determine if there is a consistent practice. *See Vega*, 188 F.3d at 299 ("[E]vidence related to how an administrator has interpreted

terms of the plan in other instances is admissible."); *Wildbur*, 974 F.2d at 638 ("Determining whether the administrator has given a uniform construction to a plan may require a court to evaluate evidence of benefit determinations other than the one under scrutiny."). Fralick has not demonstrated that this exception is inapplicable to these documents, and therefore the court denies the motions to strike to the extent they are directed toward these materials.

E

In sum, except for Fralick's deposition testimony, the evidence that is the subject of his motions to strike is admissible. The deposition transcript is inadmissible for the reasons explained. Any flaws in the other evidence, however, are less readily apparent, and Fralick has chosen to forgo a sufficient identification and analysis of the evidence that might demonstrate why the evidence is inadmissible. Moreover, it does not appear that the Fund has relied on any of the evidence, other than the deposition testimony, to raise new arguments that the trustees did not consider, or that the other evidence presents facts that would not have been available as part of the administrative process. Finally, Fralick has not identified any factual errors or discrepancies in the evidence that the court has deemed admissible.

The court therefore grants the motions as they relate to the deposition testimony and otherwise denies them.

- 16 -

III

The court now turns to the merits of the Fund's motion for summary judgment and Fralick's motion for judgment on the pleadings and, in doing so, begins again with a threshold procedural issue.

A

Fralick moves under Rule 12(c) for judgment on the pleadings establishing that the Fund trustees abused their discretion when they found him disqualified for Plan benefits.  A Rule 12(c) motion "is designed to dispose of cases where the material facts are not in dispute and a judgment on the merits can be rendered by looking to the substance of the pleadings and any judicially noticed facts." *Hebert Abstract Co. v. Touchstone Props., Ltd.*, 914 F.2d 74, 76 (5th Cir. 1990) (per curiam) (citing 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1367, at 509-10 (1990)).  The motion should be granted only if there is no issue of material fact and if the pleadings show that the moving party is entitled to prevail as a matter of law. *Greenberg v. Gen. Mills Fun Group, Inc.*, 478 F.2d 254, 256 (5th Cir. 1973).  The standard for deciding a motion under Rule 12(c) is the same as the one for deciding a motion to dismiss under Rule 12(b)(6). *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 313 n.8 (5th Cir. 2002) ("A number of courts have held that the standard to be applied in a Rule 12(c) motion is identical to that used in a Rule 12(b)(6) motion." (footnote omitted) (quoting 5A

Wright & Miller, *supra*, § 1368, at 591 (Supp. 2002)).

"Motions filed under [Rule] 12(b)(6) and 12(c) are designed to test the sufficiency of the pleadings, and courts do not consider materials outside those pleadings in deciding those motions." *In re Carmelita, Inc.*, 2009 WL 2356488, at *2 (S.D. Tex. July 29, 2009). Although courts cannot ordinarily consider materials outside the pleadings in deciding a motion to dismiss, they may do so when those documents are central to the plaintiff's claims and are referred to in the plaintiff's complaint. *See In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007). "Documents that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim." *Causey v. Sewell Cadillac-Chevrolet, Inc.*, 394 F.3d 285, 288 (5th Cir. 2004). "In so attaching [such materials], the defendant merely assists the plaintiff in establishing the basis of the suit, and the court in making the elementary determination of whether a claim has been stated." *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 499 (5th Cir. 2000). Furthermore, "matters incorporated by reference or integral to the claim [and] items appearing in the record of the case . . . may be considered by the district judge without converting the [12(b)(6)] motion into one for summary judgment." 5B Wright & Miller, *supra* § 1357, at 376 (3d ed. 2004).

Rule 12(d) provides that if, in a motion to dismiss, "matters

outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment." A motion for judgment on the pleadings can be converted into a motion for summary judgment if it relies on anything outside the pleadings and incorporated materials, even if the new material is submitted by the *nonmoving party* in response to the motion. *See, e.g., Flores v. Sullivan*, 945 F.2d 109, 110 n.3 (5th Cir. 1991).

B

The Fund asserts that consideration of materials outside the pleadings is necessary for the court to evaluate fully whether the trustees abused their discretion. It posits that Fralick did not attach the full administrative record to his complaint, but selectively chose the portions of the record that favored him. The Fund asserts that the entire record must be considered for the court to determine the ultimate issues in this case. Moreover, it argues that Fralick's complaint and supporting materials do not include any evidence of how the Fund has interpreted the relevant provision of the Plan in similar cases; therefore, the court cannot determine from the complaint and supporting materials whether the Fund's interpretations here are consistent, as is required. *See infra* § V(B)(1). Fralick responds that the Fund had the opportunity to attach such documents to its answer, and because it chose not to, it must rely only on the pleadings and incorporated documents in opposing his Rule 12(c) motion.

- 19 -

The court holds that deciding Fralick's motion for judgment on the pleadings requires that the court consider documents that exceed in scope those that are properly consulted in addition to the complaint. Consequently, it concludes that Fralick's motion should be converted to a summary judgment motion. Fralick apparently does not dispute that the attachments to his complaint omit documents that are properly considered part of the administrative record. The court must consult the entire record to determine whether the trustees' decision was an abuse of discretion. The court is therefore unable to make a ruling based on the pleadings alone. And as the Fund points out, the court has no way of determining whether the Fund's interpretation of terms in the Plan here is consistent with other cases. The court cannot reach a conclusion in this respect without consulting documents that exceed the complaint and the documents that are properly consulted when addressing a Rule 12(c) motion.

The next procedural question is whether the court should notify the parties and allow additional briefing before deciding Fralick's converted motion. "A party is on notice of the possibility that a court may convert a motion to dismiss into a motion for summary judgment ten days after a party submits evidence outside of the pleadings if the evidence is not excluded by the court." *Rainwater v. 21st Mortgage Corp.*, 2010 WL 1330624, at *7 n.11 (E.D. Tex. Feb. 25, 2010) (citing *Wash. v. Allstate Ins. Co.*,

- 20 -

901 F.2d 1281, 1284 (5th Cir. 1990)).  "[T]he simple act of placing matters outside the pleadings before the court provides adequate notice that a motion to dismiss may be converted into a motion for summary judgment."  *Mackey v. Owens*, 182 F.3d 915, *2 (5th Cir. 1999) (per curiam) (unpublished opinion) (holding that nonmovant was put on notice of potential conversion to summary judgment when movant attached affidavits to Rule 12(b)(6) motion).  Because Rule 12(d) applies to Rule 12(c) motions as well as to Rule 12(b)(6) motions,[6] cases applying Rule 12(d) to Rule 12(b)(6) motions guide the treatment of Rule 12(c) motions as well.  Indeed, notice of conversion would appear to be more important to the nonmovant (who may need to present summary judgment evidence) than to the movant, and the Fund (the nonmovant in relation to Fralick's motion) has itself relied on additional documents to file its response to Fralick's motion as well as its own motion for summary judgment.

Moreover, it is not apparent that either party would benefit were the court to provide notice and another opportunity for briefing.  "[D]istrict courts are widely acknowledged to possess the power to enter summary judgments *sua sponte*, so long as the

---

[6]Rule 12(d) provides:

> If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56.  All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion.

losing party was on notice that she had to come forward with all of her evidence." *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986). Because the Fund has moved for summary judgment, Fralick and the Fund have both had the opportunity to submit summary judgment evidence.   And because, with limited exceptions, the court in deciding this case is confined to the administrative record, and neither party contends that any relevant portions of the record have yet to be submitted, it is unlikely that additional briefing or submissions are necessary to ensure a fair decision.

Accordingly, Fralick's motion for judgment on the pleadings under Rule 12(c) is converted to a summary judgment and will be decided accordingly.

IV

Having determined the scope of the record and the procedural posture of Fralick's motion, the court now considers both summary judgment motions together.

Both parties agree that the Plan is subject to ERISA.  "A plan participant who is denied benefits under an ERISA plan can sue to recover them." *Leake v. Kroger Texas, L.P.*, 2006 WL 2842024, *4 (N.D. Tex. Sept. 6, 2006) (Fitzwater, J.) (citing 29 U.S.C. § 1132(a)(1)(B)).   This court has jurisdiction to review determinations made by an ERISA employee benefit plan. *Vega*, 188 F.3d at 295.   In reviewing a decision by an ERISA plan administrator—here, the trustees of the Fund—factual

determinations are always given deference, and are reviewed only for abuse of discretion. *Vercher v. Alexander & Alexander Inc.*, 379 F.3d 222, 226 (5th Cir. 2004). "[F]or factual determinations under ERISA plans, the abuse of discretion standard of review is the appropriate standard; that is, federal courts owe due deference to an administrator's factual conclusions that reflect a reasonable and impartial judgment." *So. Farm Bureau Life Ins. Co. v. Moore*, 993 F.2d 98, 101 (5th Cir. 1993) (internal quotation marks omitted).

An administrator's interpretation of the terms of the plan, as opposed to a determination of the underlying facts, however, can be reviewed differently depending on the level of discretion given to the administrator by the plan. *See Vercher*, 379 F.3d at 226. "[A] denial of benefits challenged under [ERISA] § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). The parties do not dispute that the trustees have discretionary authority over the Plan.[7]  Thus "[i]n this case, because the Plan

---

[7]The Plan vests the Fund trustees with "the exclusive right and discretionary authority to construe the terms of the Plan, to resolve any ambiguities, and to determine any questions which may arise with the Plan's application or administration, including but not limited to determination of eligibility for benefits." D. App. 25.

undisputedly gives the Plan Administrator the discretionary authority to construe the Plan's terms and to render benefit decisions, we reverse the Plan Administrator's denial of benefits to [Fralick] only if it abused its discretion." *Holland v. Int'l Paper Co. Ret. Plan*, 576 F.3d 240, 246 (5th Cir. 2009).

In cases where discretion is given to ERISA plan administrators, a district court employs a two-step process to evaluate the interpretation of the terms of the plan. "First, it determines whether the administrator gave the Plan a legally correct interpretation. Second, it decides whether the incorrect decision constitutes an abuse of discretion." *Krusos v. Atl. Richfield Co.*, 2003 WL 21383656, at *5 (N.D. Tex. June 11, 2003) (Fitzwater, J.). Courts consider three factors in answering the first inquiry (i.e., whether the Fund's interpretation of the Plan was legally correct): "(1) whether the administrator has given the plan a uniform construction, (2) whether the interpretation is consistent with a fair reading of the plan, and (3) any unanticipated costs resulting from different interpretations of the plan." *Wildbur*, 974 F.2d at 638. If "the fiduciary's interpretation of the plan was legally correct, the inquiry is over, pretermitting any need to consider whether a legally incorrect interpretation of the fiduciary was not an abuse of discretion." *Ellis v. Liberty Life Assurance Co. of Boston*, 394 F.3d 262, 270 (5th Cir. 2004). "If the determination was legally

correct, there is no abuse of discretion; if it was incorrect, then [the court] must review whether that interpretation was an abuse of discretion." *Holland*, 576 F.3d at 246 n.2. It is not automatically an abuse of discretion for a plan administrator to improperly interpret the terms of the plan. *Allen v. Travelers Ins. Co.*, 29 F.3d 624, *2 (5th Cir. 1994) (unpublished opinion). But "[i]f the administrator's legal interpretation of the plan was correct, the inquiry ends, because a legally correct interpretation of a plan cannot constitute an abuse of discretion." *Krusos*, 2003 WL 21383656, at *5.

Assuming that the plan administrator's interpretation of the terms is incorrect, the court then turns to the question of abuse of discretion. "Three factors are important in this analysis: (1) the internal consistency of the plan under the administrator's interpretation, (2) any relevant regulations formulated by the appropriate administrative agencies, and (3) the factual background of the determination and any inferences of lack of good faith." *Wildbur*, 974 F.2d at 638. The court will reverse the Fund's denial of benefits only if the decision was not rational or supported by substantial evidence in the record. *See, e.g., Green v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, 1999 WL 417925, at *2 (N.D. Tex. June 22, 1999) (Fitzwater, J.). "A plan administrator abuses its discretion where the decision is not based on evidence, even if disputable, that clearly supports the basis for its denial."

- 25 -

*Holland*, 576 F.3d at 246 (internal quotation marks omitted). "Review of the administrator's decision need not be particularly complex or technical; it need only assure that the administrator's decision falls somewhere on a continuum of reasonableness——even if on the low end." *Leake*, 2006 WL 2842024, at *5 (internal quotation marks and alteration omitted) (quoting *MacLachlan v. ExxonMobil Corp.*, 350 F.3d 472, 478 (5th Cir. 2003)).

Finally, "if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a factor in determining whether there is an abuse of discretion." *Bruch*, 489 U.S. at 115 (internal quotation marks and alteration omitted). Courts do not apply a different standard of review to cases where plan administrators are alleged to have some level of conflict of interest in making their benefits determination. *Holland*, 576 F.3d at 247. "Quite simply, 'conflicts are but one factor among many that a reviewing judge must take into account.'" *Id.* at 247-48 (quoting *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 128 S.Ct. 2343, 2351 (2008)).

V

A

The Fund trustees' ultimate reason for denying Plan benefits to Fralick is that his "employment with Brandt Electric is Disqualifying Employment, since such work is for an employer in a

related business as a Contributing Employer.  This determination
was made in accordance with Section 9.07(a)(i)(B) of the Plan." D.
App. 92.  Section 9.07(a)(i)of the Plan provides:

> "Disqualifying Employment," for the period
> before Normal Retirement Age, is:
>
> > (A) Employment with any Contributing
> > Employer.
> >
> > (B) Employment with any employer in
> > the same or related business as any
> > Contributing Employer.
> >
> > (C) Self-employment in the same or
> > related business as a Contributing
> > Employer.
> >
> > (D) Employment or self-employment in
> > any business which is under the
> > jurisdiction of the Union.
>
> . . .

D. App. 27.  In support of this determination, the Fund now offers
several arguments, and it points to evidence that the trustees were
within their discretion to conclude that Brandt Electric and Brandt
Engineering were sister companies.

Fralick does not dispute the corporate relationship between
Brandt Electric and Brandt Engineering.  He does assert, however,
that he worked only for Brandt Electric, which does not do any work
in the plumbing or pipefitting industry.  Fralick submitted
correspondence to this effect during the administrative review
process, including letters from executives at Brandt Electric
confirming his statements about the company's work.

- 27 -

In their determination letters, the trustees did not dispute
Fralick's employment with Brandt Electric rather than Brandt
Engineering, the evidence that Brandt Electric does not engage in
plumbing and pipefitting work, or the assertion that the two
companies are distinct.  Furthermore, the Fund does not now argue
that working for an electrical contractor is *per se* incompatible
with the requirements to be "retired" under the Plan.  Instead, the
Fund simply concluded, and still maintains, that "Fralick was
employed with an employer 'related' to a Contributing Employer,"
due to the corporate relationship between the two Brandt
companies.[8]  D. Br. 11.

B

The court evaluates the Fund's legal interpretation of the
Plan under an abuse of discretion standard.  "In reviewing a plan

---

[8]For purposes of this litigation, the Fund also contends that
Fralick was ineligible for benefits under § 9.07(a)(i)(A) and (D)
of the Plan.  These arguments, however, depend almost entirely on
evidence that the court has found to be inadmissible (i.e., the
transcript of Fralick's deposition), as explained *supra* at § II.
Because this evidence was not part of the administrative record,
and therefore cannot be used to determine factual questions
underlying Fralick's claim, the court rejects the Fund's arguments
based on the deposition evidence.  The only non-deposition evidence
relevant to the Fund's arguments under subparagraphs (A) and (D) is
the single line in the letter from the business manager of the
Union local that Fralick was "currently employed by Brandt
Engineering." D. App. 58.  Without more, this is not substantial
evidence supporting a claim that Fralick violated subparagraph (A)
or (D), and it is therefore insufficient to support the Fund's
argument.  Moreover, the court notes that the Fund trustees relied
exclusively on subparagraph (B) in their letters to Fralick denying
his appeals, and they do not appear even to have considered the
theories that the Fund's attorneys now present.

for abuse of discretion, the district court first must determine whether the administrator's interpretation is legally correct; if it is not, the court must decide whether the decision was an abuse of discretion." *Leake*, 2006 WL 2842024, at *4.

1

The first step in determining whether the interpretation is legally correct is "whether the administrator has given the plan a uniform construction." *Wildbur*, 974 F.2d at 638. Courts addressing this question ask whether the ERISA plan administrators "consistently apply the Plan to similarly situated applicants." *Stone v. UNOCAL Termination Allowance Plan*, 570 F.3d 252, 258 (5th Cir. 2009). The Fund asserts that its interpretation of § 9.07(a)(i)(B) is consistent with its practice in other cases. It cites two examples of disputes in which it maintains a similar application was used. These examples are not particularly helpful. The materials are heavily redacted, preventing the court from understanding the relationship between the companies at issue. Moreover, the documents in the two examples repeatedly refer to § 9.07 of the Plan, but they only occasionally specify § 9.07(a)(i)(B). Therefore, it is not clear that, as here, § 9.07(a)(i)(B) served as the exclusive reason for the trustees' decision. Regardless, because the court would reach the same decision ultimately, it will assume *arguendo* that the Fund has consistently interpreted the terms of the Plan.

2

The second step requires that the court evaluate "whether the interpretation is consistent with a fair reading of the plan." *Wildbur*, 974 F.2d at 638.  This "is the most important factor." *Stone*, 570 F.3d at 260 ("Under any ERISA plan, the eligibility for benefits is governed in the first instance by the plain meaning of the plan language." (internal quotation marks omitted)).  "We interpret ERISA plans 'in their ordinary and popular sense as would a person of average intelligence and experience.'  In other words, we must interpret ERISA provisions as they are likely to be 'understood by the average plan participant, consistent with the statutory language.'" *Crowell v. Shell Oil Co.*, 541 F.3d 295, 314 (5th Cir. 2008) (quoting *Tucker v. Shreveport Transit Mgmt. Inc.*, 226 F.3d 394, 398 (5th Cir. 2000)) (alteration omitted).  Courts must ensure that term language is "given its generally accepted meaning if there is one." *Chacko v. Sabre, Inc.*, 473 F.3d 604, 612 (5th Cir. 2006) (internal quotation marks omitted).

Courts employ various methods to determine the fair reading of plan terms.  The plain meaning of a term should not result in portions of the plan becoming "meaningless surplusage," nor should the interpretation conflict with other parts of the contract. *See Ellis*, 394 F.3d at 272; *see also Izzarelli v. Rexene Prods. Co.*, 24 F.3d 1506, 1520 (5th Cir. 1994).  An interpretation of a plan that would lead to an "unexpected result," *see Chacko*, 473 F.3d at 612,

or an "unreasonable" outcome, *see Sanders v. Rubicon Inc.*, 103 F.3d 126, at *4 (5th Cir. 1996) (unpublished opinion), is unlikely to constitute a fair reading.  Courts may consider whether a posited interpretation "furthers the overall plan goal[s]." *Gosselink v. Am. Tel. & Tel., Inc.*, 272 F.3d 722, 729 (5th Cir. 2001); *see also Ellis*, 394 F.3d at 271 (considering "the context of the Policy as a whole" when determining plain meaning of a term); *Whittaker v. BellSouth Telecomms., Inc.*, 206 F.3d 532, 353 (5th Cir. 2000) (evaluating overarching purpose of benefit plan as part of fair reading analysis).  Dictionary definitions can also prove helpful in identifying the common meaning of words in a plan document.  *See Branson v. Greyhound Lines, Inc., Amalgamated Council Ret. & Disability Plan*, 126 F.3d 747, 758 (5th Cir. 1997).

Basic contract interpretation principles can be utilized to determine the meaning of a plan.  *See id.* ("The Latin maxim *expressio unius est exclusio alterius* proves instructive.").  Moreover, "ambiguities in insurance policies are construed against the insurer" when conducting a fair reading analysis of ERISA benefit plans.  *See Lain v. UNUM Life Ins. Co. of Am.*, 279 F.3d 337, 345 (5th Cir. 2002).

Neither the Plan nor the Summary Plan Description ("SPD") that accompanies the Plan provides any definition for "business" as it is used in the relevant sections.  The Fund's arguments make clear, however, that its reliance on § 9.07(a)(i)(B) depends on

interpreting the word "business" to mean the equivalent of "business organization" or "company." As the Fund asserts in its motion for summary judgment, "Fralick was employed with an employer 'related' to a Contributing Employer." D. Br. 11. Because Brandt Electric and Brandt Engineering were "related"——in the sense that both belonged to the same corporate family——Fralick's employment with Brandt Electric constituted disqualifying employment. This interpretation would effectively require that § 9.07(a)(i)(B) be read to prohibit "Employment with any employer in the same or related business [organization] as any Contributing Employer."

The court holds that a plain reading of the Plan does not support the Fund's interpretation, and that the meaning of the term "business" is at best ambiguous, if not clearly contrary to the Fund's view. Rather than "company," a fairer meaning to ascribe to "business" is "occupation" or "line of work." In other words, § 9.07(a)(i)(B) would prohibit employment in the same or related line of work as any contributing employer. The provision is thus concerned with retirees' performing work akin to plumbing and pipefitting, not with the corporate structure of beneficiaries' employers.

The Fund's original interpretation of subparagraph (B) in Fralick's case is consistent with the court's plain reading of the terms and inconsistent with the Fund's arguments following Fralick's appeals and in this litigation. In its December 22, 2006

- 32 -

letter to Fralick, the Fund wrote:

> Any work that has any relation to work
> covered by the [Fund] is disqualifying
> employment under the plan rules for retirees
> who have not reached normal retirement age
> (65). Such work would be a violation of
> subsection (b), in that such work is for any
> employer in a related business as a
> Contributing Employer since the electrical
> contracting company would be having these
> individuals perform mechanical CAD work, which
> is work done by Contributing Employers to the
> [Fund], and thus work that is done by an
> employer in the same or related business.

D. App. 61. The Fund's interpretation in this letter makes clear
that the disputed language is concerned with employment for a
company that is engaged in "work that has any relation to work
covered by the Fund" and "work done by Contributing Employers,"
such as "mechanical CAD work." Only after Fralick
appealed——arguing that Brandt Electric did not do any "mechanical
CAD work," a fact that is uncontested in the administrative
record——did the Fund change its interpretation to apply
subparagraph (B) to corporate relationships. Thus the initial
interpretation by the Fund fully supports the court's reading:
subparagraph (B) covers employment with an employer engaged in the
same or related line of work as any contributing employer. It is
not concerned with the corporate relationships of a beneficiary's
employer.

Turning to the SPD, "if there is a conflict between the
summary plan description and the terms of the policy, the summary

plan description shall govern.   Any other rule would be, as the Congress recognized, grossly unfair to employees and would undermine ERISA's requirement of an accurate and comprehensive summary." *Parker v. Owens-Ill. Inc.*, 275 F.3d 43, at *3 (5th Cir. 2001) (per curiam) (unpublished opinion) (quoting *Hansen v. Cont'l Ins. Co.*, 940 F.2d 971, 982 (5th Cir. 1991)).   "[T]he rule of *contra proferent[e]m*, that ambiguities in contracts are to be resolved against the drafter, must be applied when a summary plan description contains an ambiguous term or requirement." *Rhorer v. Raytheon Eng'rs & Constructors, Inc.*, 181 F.3d 634, 640-41 (5th Cir. 1999).

> In contracts of insurance generally, ambiguities are resolved against the drafter. The same rule should apply here; the ambiguity in the summary plan description must be resolved in favor of the employee and made binding against the drafter.   Any burden of uncertainty created by careless or inaccurate drafting of the summary must be placed on those who do the drafting, and who are most able to bear that burden, and not on the individual employee, who is powerless to affect the drafting of the summary or the policy and ill equipped to bear the financial hardship that might result from a misleading or confusing document.   Accuracy is not a lot to ask.   And it is especially not a lot to ask in return for the protection afforded by ERISA's preemption of state law causes of action—causes of action which threaten considerably greater liability than that allowed by ERISA.

*Hansen*, 940 F.2d at 982 (citation omitted).

The SPD chapter entitled, "Working After

- 34 -

Retirement——Suspension of Benefits," states: "When you retire from the trade in the plumbing and pipefitting industry, you can work in other industries and continue to receive your pension.  However, once you retire . . ., your monthly benefits will be suspended if you return to work in 'Disqualifying Employment.'"  D. Jan. 11, 2010 App. 3.  The SPD includes nearly verbatim the disputed language from § 9.07(a)(i)(B) of the Plan, without providing any guidance on the intended meaning of "same or related business."  The evidence here points to a concern on the part of the Plan about post-retirement work in the plumbing and pipefitting industry rather than with a corporate sister of a company engaged in such work.

The language of § 9.07(a)(i)(B) is, at best, ambiguous regarding whether business means "company" or "line of work."  The SPD language established that Fralick could "work in other industries [besides the plumbing and pipefitting industry] and continue to receive [his] pension."  D. Jan. 11, 2010 App. 3.  Reading the "disqualifying employment" language according to the "ordinary and popular sense as would a person of average intelligence and experience," the court cannot say that Fralick should have understood that employment with an electrical contractor in the same corporate family as a mechanical contractor was prohibited.  "Absent a clear expression of this significant limitation, the SPD cannot be fairly read to prohibit" Fralick from

- 35 -

working for Brandt Electric. *See Parker*, 275 F.3d 43, at \*4. "Therefore, as the terms of the SPD are inconsistent with the terms of the Retirement Plan, the SPD controls the outcome of this case." *Id.* at \*3.

Apart from the SPD, other factors counsel against adopting the Fund's interpretation as a fair reading of the term "business." Webster's Dictionary supports the court's interpretation as the more common usage of the word. *See, e.g., Chacko*, 473 F.3d at 612 (consulting dictionary definition when interpreting ERISA plan terms). The first listed definition is: "The occupation, work, or trade in which one is engaged." Webster's II New Riverside University Dictionary 212 (1984). The third definition coincides with the Fund's reading of the term: "A commercial enterprise or establishment or gain." *Id.* Black's Law Dictionary offers a definition of "business" that slightly blends the two concepts. Its first definition is "[a] commercial enterprise carried on for profit; a particular occupation or employment habitually engaged in for livelihood." Black's Law Dictionary 226 (9th ed. 2009). The second definition is "commercial enterprises." *Id.*

The court also examines the internal consistency of the Plan itself. When read in tandem with § 9.07(a)(i)(C) and (D), which also use the term "business," as well as subparagraph (A), which prohibits "work for any Contributing Employer," the best interpretation of the term is that it means "line of work."

Subparagraph (C) prohibits "Self-employment in the same or related business as a Contributing Employer." Applying the Fund's interpretation of "business" in § 9.07(a)(i)(B) to subparagraph (C) results in the prohibition against "self employment in the same or related business [organization] as a Contributing Employer."

It is possible that, by prohibiting "self-employment" in the same business as a contributing employer, the Plan intended to bar some sort of contracting arrangement whereby a beneficiary would be "self-employed," but still in the same company as a contributing employer. But this goal is more simply achieved by defining "employment" to include work as a contractor. It is difficult to conceptualize a scenario in which a beneficiary would be "self-employed" in the same business organization as a contributing employer; those who are self-employed are their own business organization. The same analysis applies to the part of § 9.07(a)(i)(D) that precludes self-employment in any business under Union jurisdiction.

Similar problems arise when subparagraphs (A) and (B) are read in tandem using the Fund's interpretation. The Fund's preferred reading would render (A) ("Employment with any Contributing Employer") and part of (B) ("Employment with any employer in the same . . . business [organization] as any Contributing Employer") duplicative and surplusage. Admittedly, there may be some conceivable scenario in which a "contributing employer" and "an

employer in the same company as a contributing employer" refer to different entities, but this would hardly be the generally accepted meaning. The Fund's reading gives the two subparagraphs a duplicative meaning and therefore is unlikely to constitute a fair reading, especially if a better alternative is available.

On the other hand, if "business" in § 9.07(a)(i)(B) means "occupation" or "line of work," a retiree like Fralick would quite logically be precluded under (C) from self-employment in the same or related occupation as a contributing employer, or under (D) from a line of work under Union jurisdiction. This would prevent beneficiaries from "retiring" and then becoming self-employed doing work that is the same or related to work being done by contributing employers to the Fund. Moreover, (B) would cover employment in the same or related occupation as a contributing employer, and would thus be complementary——rather than duplicative——of (A). The focus would be on the type of work being performed——consistent with the language and tone of the SPD——rather than on corporate relationships.

The court must "interpret the contract language in an ordinary and popular sense as would a person of average intelligence and experience, such that the language is given its generally accepted meaning if there is one." *Chacko*, 473 F.3d at 612. Although it may be possible to construct facts that justify the Fund's interpretation, it is not how a typical person would read the

phrase. The court cannot say that Fralick should have understood the section to prohibit his working in the electrical engineering field, simply because his employer had a corporate affiliation with a contributing employer. Accordingly, the Fund's interpretation is not a fair reading of the term "business." The alternate reading—"line of work" or "occupation"—allows all the terms in § 9.01(a)(i) to be given their generally accepted meaning, avoids surplusage, and is the fairest reading of the term.

Moreover, as the above discussion makes clear, there are at least two reasonable ways to interpret "business" in § 9.07(a)(i)(B). The court must construe the terms according to their plain meaning. "If, however, the plan terms remain ambiguous after application of ordinary principles of contract interpretation, they are construed strictly in favor of the insured." *Keszenheimer v. Reliance Standard Life Ins. Co.*, 402 F.3d 504, 507 (5th Cir. 2005). Thus to the extent that, when the Plan is analyzed, it is not conclusive that "line of work" is the generally accepted interpretation of "business" in this context, the term is ambiguous and must be construed in favor of Fralick.

The Fund's reading would lead to unreasonable results in cases with facts different from Fralick's. If § 9.07(a)(i)(B) prohibits beneficiaries from employment with any company who shares a corporate affiliation with (and is therefore "related" to) a Contributing Employer, this would foreclose employment that has

nothing to do with the plumbing and pipefitting industry.   The
Fund's interpretation would place restrictions on beneficiaries'
being employed, for example, by a furniture retail store, if that
store had a corporate affiliation with a contributing employer.   It
is difficult to envision any plausible interest served by the
Plan's prohibiting employment in the retail furniture business,
merely because of some happenstance in the employer's corporate
structure.   This is especially true because the SPD states that
beneficiaries *can* work in other industries.   That the Fund's
interpretation would lead to such an "unexpected result" is further
evidence that it is not a fair reading of the term.   *See Chacko*,
473 F.3d at 612.[9]

---

[9]The court's interpretation of the Plan language is consistent
with the conclusions of other courts that have interpreted
virtually identical language.   These cases are not direct evidence
of what is a fair reading of the term in the context of this case;
instead, they are illustrative of the generally accepted
understanding of the phrase "same or related business."

   In one pension benefits case, the court interpreted a
provision identical to the one at issue here to inquire whether
there were "contributing employers who *perform work* in the same or
related business" as the beneficiaries' employer.   *Wildeboer v.
Sheet Metal Workers' Nat'l Pension Fund*, 2010 WL 821122, at *8
(E.D. Ky. Mar. 5, 2010) (emphasis added).   The court did not
mention, much less analyze, whether there was any other entity
within the employer's corporate family who was engaged in relevant
work.   Instead, the court focused on the type of work actually
performed by the beneficiary and his employer in the relevant
period.   It concluded that "the services rendered by Wildeboer——in
this case welding——constituted services provided by contributing
employers."   *Id.*   An identical application of "same or related
business" was used in *Morton v. Sheet Metal Workers' National
Pension Fund*, where the key determinations in the court's analysis
were that the beneficiary's employer "performed abatement services"
and "engaged in lead and asbestos abatement."   *Morton v. Sheet*

For the reasons explained, the Fund's proposed interpretation of § 9.07(a)(i)(B) is inconsistent with a fair reading of the Plan. The Fund's interpretation appears to be incongruous with the overall focus of the Plan (i.e., on the type of work being performed), and with the language of the SPD. The plain meaning of "business" is at best ambiguous and must therefore be construed against the Fund. It cannot be said that the average person, or Fralick, would understand that § 9.07(a)(i)(B) prohibits him from working for a company who shares some corporate affiliation with a contributing employer. Accordingly, the Fund's interpretation is inconsistent with a fair reading of the Plan terms.

3

The third step in the court's analysis is whether there would be "any unanticipated costs resulting from different interpretations of the plan." *Wildbur*, 974 F.2d at 638. As the court has held, the Fund's interpretation is not a fair reading of the Plan. Courts analyze whether a cost is truly "unanticipated" in conjunction with the analysis of whether the plan administrator

---

*Metal Workers' Nat'l Pension Fund*, 2009 WL 1809988, at *6 (E.D. Va. June 23, 2009). In another case, the district court analyzed the question whether the beneficiary was employed in the "same or related business" as a contributing employer by examining "whether pipefitting is, in fact, a business related to insulation." *Asbestos Workers Local 53 Pension Benefit Fund v. Dupuis*, 1992 WL 165675, at *5 (E.D. La. July 6, 1992). The court is not aware of any case in which the language has been interpreted to cover the circumstance where two companies perform dissimilar work, but merely belong to the same corporate family.

applied a fair reading to the terms. *Crowell*, 541 F.3d at 316-17.

> If . . . an administrator had been
> interpreting the plan contrary to its plain
> language, and an alternate interpretation
> using a fair reading of the plan's plain
> language suggested that more benefits were
> due, that alternate interpretation would
> result in costs that were not subjectively
> anticipated by the employer but *should have*
> been objectively anticipated.  As such, an
> alternate interpretation under a fair reading
> would not result in unanticipated costs.

*Id.* at 317 (emphasis in original).  Giving the Plan language its most plausible meaning cannot be said to cause "unanticipated" costs; plan administrators should anticipate that terms will be applied according to their fair meaning.  "The question of 'unanticipated' costs is more accurately approached as an inquiry into the plain reading of the plan language and whether a proposed alternate reading would result in costs unanticipated under the plain meaning."  *Id.* at 316.

The Fund maintains that a contrary reading will lead to unanticipated costs due to additional benefit payments to Fralick and other similarly-situated beneficiaries.  This argument is misplaced.  In every case in which an ERISA beneficiary brings a meritorious challenge, the plan stands to face costs that it did not predict (for the simple reason that the administrators had been incorrectly interpreting the plan).  Moreover, "to determine whether an interpretation results in unanticipated costs a court may be required to review what costs were anticipated and what

costs may flow from the challenged interpretation." *Wildbur*, 974 F.2d at 638.   The Fund has failed to demonstrate——or even argue——that there are significant numbers of persons like Fralick or that it has heavily relied on the interpretation of § 9.07(a)(i)(B) that it urges here.   There is thus no basis to support the claim that an alternate reading of the term would lead to significant unanticipated costs.

4

Accordingly, the court holds that the Fund's interpretation of the Plan is not legally correct.

C

The court considers next whether the Fund's legally incorrect interpretation constitutes an abuse of discretion.   *See Krusos*, 2003 WL 21383656, at *5.[10]

1

The first factor to be considered is the internal consistency

---

[10]Although the *Wildbur* two-step approach is commonly used in the Fifth Circuit, a court is not required to determine that a plan administrator abused his discretion.   "[T]he reviewing court is not rigidly confined to this two-step analysis in every case.   As noted in [*Wildbur*], 'application of the abuse of discretion standard *may* involve the two-step process.'"   *Duhon v. Texaco, Inc.*, 15 F.3d 1302, 1307-08 & n.3 (5th Cir. 1994) (alterations omitted; emphasis in original).   Based on the court's conclusion that the Fund's application of § 9.07(a)(i)(B) is contrary to a fair interpretation of the text, the second step of *Wildbur* takes on less significance. "Clearly, if an administrator interprets an ERISA plan in a manner that directly contradicts the plain meaning of the plan language, the administrator has abused his discretion even if there is neither evidence of bad faith nor of a violation of any relevant administrative regulations."   *Gosselink*, 272 F.3d at 727.

of the plan under the administrator's interpretation. *Wildbur*, 974 F.2d at 638.   The court has already determined that the Fund's interpretation is contrary to a fair reading of the terms and is difficult to reconcile when compared to other Plan provisions. Furthermore, the interpretation is inconsistent with the SPD, which indicates that the motivating concern (at least as relevant in this context) pertains to beneficiaries who work in the plumbing and pipefitting trade while drawing plan benefits, not to retirees who work in another trade for an employer who does not contribute to the Fund and is not under the Union's jurisdiction.   Thus the first factor favors the conclusion that the trustees abused their discretion.

2

The second factor focuses on "any relevant regulations formulated by the appropriate administrative agencies." *Wildbur*, 974 F.2d at 638.   "ERISA requires that plan participants be provided with an accurate, comprehensive, easy to understand summary of the plan." *Parker*, 275 F.3d 43, at *5 (quoting *Hansen*, 940 F.2d at 980); *see also* 29 U.S.C. § 1022(a) (providing that summary plan description must be furnished to participants and beneficiaries, be written in manner calculated to be understood by average plan participant, and be sufficiently accurate and comprehensive to reasonably apprise participants and beneficiaries of their plan rights and obligations).   Under the administrative

regulations, the summary plan description "must not have the effect [of] misleading, misinforming or failing to inform participants and beneficiaries," 29 C.F.R. § 2520.102-2(b) (2010), and it must include "a statement clearly identifying circumstances which may result in disqualification, ineligibility, or denial . . . of any benefits that a participant or beneficiary might otherwise reasonably expect the plan to provide," *id.* at 2520.102-3(l). Although in the present case it is the interpretation of § 9.07(a)(i)(B), not the SPD, that is at issue, applying the interpretation that the Fund advocates would likely make the SPD misleading.

The parties disagree over whether ERISA § 203 applies to Fralick's circumstances and, if so, whether it prohibits the Fund from denying the benefits he seeks. Section 203 bars forfeiture of a vested pension benefit unless the beneficiary returns to work in the same industry. Thus, Fralick argues, the Fund's reading of the statute to cover his work for Brandt Electric violates § 203 and is invalid. The Fund maintains that § 203 is inapposite where, as here, the beneficiary has not yet attained the normal retirement age of 65. It cites 29 C.F.R. § 2530.203-3(a) (2010), the Secretary of Labor's interpretive regulation that purports to exempt early retirement situations from the strictures of the relevant provisions of § 203. The regulation states that "[a] plan may provide for the suspension of pension benefits which commence

prior to the attainment of normal retirement age . . . for any reemployment and without regard to the provisions of section 203(a)(3)(B)[.]"  *Id.*  Fralick concedes that the regulation applies, but he argues that it is unenforceable because the statute does not give the Secretary of Labor the power to effectively repeal a portion of the statute, which Fralick maintains would be the result of following the regulations.

Even if the court assumes *arguendo* that the Fund's argument is correct and that the regulations exempt Fralick from the general protections of § 203, the court still holds that the Fund's interpretation of the Plan is legally incorrect, and that the trustees abused their discretion.

3

The third element is "the factual background of the determination and any inferences of lack of good faith."  *Wildbur*, 974 F.2d at 638.  This factor does not bear heavily on the court's analysis.  There is no apparent factual dispute between the parties that can be identified in the administrative record.[11]  Both parties

_____

[11]The court does not consider evidence raised outside the administrative record relating to determinations of facts underlying Fralick's claim.  The *Wildbur* panel did note that "the factual background of the determination and any inferences of a lack of good faith, may, at least on the question of good faith, require the court to review evidence that was not presented to the administrator."  *Wildbur*, 974 F.2d at 638.  But *Wildbur* and other cases have made clear that, even when such evidence is considered, it is not for purposes of determining the underlying facts of the plaintiff's claim.  "We have long held that in conducting review under an abuse of discretion standard, a district court should

agree that Fralick worked for Brandt Electric, that the company was
a corporate affiliate of Brandt Engineering, and that Brandt
Engineering was a contributing employer engaged in the plumbing and
pipefitting industry.   The dispute here is over the proper
interpretation of the Plan language and whether these facts
indicate that the Fund could properly deny Fralick's benefits.
Fralick raises vague accusations that there could be a conflict of
interest——and therefore lack of good faith——on the part of the Fund
trustees, but they are not supported by the record.   A finding of
conflict of interest is generally limited to situations where a
single entity operates in two simultaneous capacities, such as
employer and administrator of the pension fund.   *See, e.g.,*
*Robinson v. Aetna Life Ins. Co.*, 443 F.3d 389, 395 (5th Cir. 2006).
That is not the case here.

D

The court holds under the Fifth Circuit's two-step approach
that the Fund trustees abused their discretion when they determined

---

evaluate the administrator's fact findings regarding the
eligibility of a claimant based on the evidence before the
administrator, assuming that both parties were given an opportunity
to present facts to the administrator." *Id.* at 639.  Moreover, the
court is considering whether the trustees abused their discretion
in deciding that, under § 9.07(a)(i)(B), Fralick's employment with
Brandt Electric rendered him ineligible for Plan benefits due to
the corporate relationship between Brandt Engineering and Brandt
Electric.   This was the sole basis raised by the Fund when it
denied Fralick's appeals.  Consideration of the previously-excluded
deposition transcript would not materially impact the resolution of
this question.

- 47 -

that Fralick was precluded under § 9.07(a)(i)(B) from receiving Plan benefits due to his employment with Brandt Electric.  The Fund's interpretation of the Plan language is contrary to a fair reading of the terms.  Accordingly, the court holds that the Fund trustees' decision was "not rational or supported by substantial evidence in the record." *Green*, 1999 WL 417925, at *2.  Although considerable deference must be accorded the decisions of plan administrators, the court cannot identify a rational basis in the administrative record for upholding the Fund's denial of Fralick's benefits.

## VI

Courts deciding in favor of ERISA beneficiaries can either remand the case to the plan administrator or enter judgment in favor of the beneficiary.  "Remand to the plan administrator for full and fair review is usually the appropriate remedy when the administrator fails to substantially comply with the procedural requirements of ERISA." *Lafleur v. La. Health Serv. & Indem. Co.*, 563 F.3d 148, 157 (5th Cir. 2009).  If "the administrator construes a plan provision erroneously, the court should not decide itself whether benefits should be awarded but rather should remand to the administrator for it to make that decision under the plan, properly construed." *Collinsworth v. AIG Life Ins. Co.*, 404 F.Supp.2d 911, 923 (N.D. Tex. 2005) (Lynn, J.) (quoting *Saffle v. Sierra Pac. Power Co. Bargaining Unit Long Term Disability Income Plan*, 85 F.3d

455, 456 (9th Cir. 1996)). Remand is appropriate where "the administrator never had occasion to exercise any discretion to interpret the terms of the Plan." *Schadler v. Anthem Life Ins. Co.*, 147 F.3d 388, 398 (5th Cir. 1998) (remanding to administrator for new determination according to the proper interpretation of plan terms). "It is not the court's function *ab initio* to apply the correct standard to the participant's claim. That function, under the Plan, is reserved to the Plan administrator." *Id.* (quoting *Saffle*, 85 F.3d at 461) (internal quotation marks and alteration omitted).

On the other hand, courts may grant summary judgment in favor of the beneficiary "'where the record establishes that the plan administrator's denial of the claim was an abuse of discretion as a matter of law.'" *Lafleur*, 563 F.3d at 158 (quoting *Gagliano v. Reliance Standard Life Ins. Co.*, 547 F.3d 230, 240 (4th Cir. 2008)). "A remand for further action is unnecessary only if the evidence clearly shows that the administrator's actions were arbitrary and capricious, or the case is so clear cut that it would be unreasonable for the plan administrator to deny the application for benefits on any ground." *Id.* (internal quotation marks omitted). In one recent unpublished opinion, the Fifth Circuit reversed a district court's grant of summary judgment on behalf of an insurance company and rendered a judgment for the beneficiary, because there was "no rational connection between the known

information and the conclusion on [the] important issue" before the plan administrator. *Alexander v. Hartford Life & Acc. Ins. Co.*, 347 Fed. Appx. 123, 126 (5th Cir. 2009) (per curiam).

In *Robinson* the Fifth Circuit vacated summary judgment in favor of the plan administrator and, although the claimant had not moved for summary judgment, entered judgment in his favor. *See Robinson*, 443 F.3d at 396-97.  The court stated:

> We have concluded both that Aetna failed to substantially comply with ERISA procedures and that Aetna abused its discretion by terminating Robinson's benefits.  Second, Aetna was required to develop its factual record at the administrative level.  Lastly, Aetna fully briefed the relevant legal issues both before this Court and below.

*Id.* at 397 (citation omitted).  The court vacated and remanded with instructions to enter judgment in favor of Robinson.  *Id.*   It denied Aetna's request for remand to the administrator.

> We reject Aetna's suggestion that remand to the administrator is required.  In *Vega*, as here, no concrete evidence supported the administrator's basis for denying benefits. We declined a remand to allow the administrator "another opportunity to make a record" because "each of the parties" must "make its record before the case comes to federal court."  *See Vega*, 188 F.3d at 302 n.13.  For the same reason, we believe that remand is inappropriate here.

*Id.* at 397 n.5.

In *Schadler* the Fifth Circuit held that the matter should be remanded to the administrator.  *See Schadler*, 147 F.3d at 398.  The administrator had relied on one basis to deny benefits at the

administrative level (that the plaintiff was not covered by the plan), but argued in the district court that coverage might apply, but exclusions within the plan supported the decision to deny benefits. *Id.* "Because Defendants denied that coverage ever existed until the matter was before the district court, the administrator never had occasion to exercise any discretion to interpret the terms of the Plan." *Id.* The application of the exclusions in the plan was a subsidiary question to that of coverage, and thus was not addressed until the administrator admitted that coverage existed in the first place. The Fifth Circuit concluded that parties to ERISA disputes should put forward all grounds in support of their positions at the administrative level, and should develop the necessary factual record for support, but held that remand was appropriate because a district court should not usurp the role of an ERISA plan administrator to interpret and apply plan terms initially. *Id.* at 397 ("[A] post hoc rationalization for a decision to deny benefits is not equivalent to an administrator's exercise of its discretion."). The *Shadler* court distinguished the case, however, from "a situation in which the administrator asserted one plan exclusion at the administrative level and trial counsel then bolstered the administrator's position before the district court with other exclusions." *Id.* at 396.

        The court concludes that, given the facts in the

administrative record and the parties' arguments, this matter need not be remanded, and the court can enter judgment for Fralick. Section 9.07(a)(i)(B) prohibits a beneficiary from working for an employer in the same or related occupation as a contributing employer.  The only substantial evidence in the record demonstrates that Fralick was employed by Brandt Electric and that the company did not perform work covered by the union.  Fralick's central argument is that his work as an electrical contractor was not disqualifying employment.  The Fund did not contest this assertion; in fact, the Fund's briefing accepts Fralick's argument as accurate.  In its summary judgment brief, the Fund states that it is "entirely correct" that working for a non-union electrical contractor would not constitute disqualifying employment.  D. Br. 20.[12]  Of course, the Fund also argues that Fralick's work *was* disqualifying because Brandt Electric was "related" to a contributing employer; that is, even if electrical contracting work is not *per se* disqualifying, Fralick's work for *this* electrical contractor was disqualifying because of the employer's corporate siblings.  The court has rejected this reading of § 9.07(a)(i)(B). The Fund's argument for denying benefits thus falls away, leaving only its admission that "work . . . for a non-union electrical

---

[12]The Fund makes this statement in its discussion of Fralick's claim for promissory estoppel, which the court does not reach.  The statement is nonetheless probative of the fact that electrical contracting work is not disqualifying employment *per se*.

contractor would not be considered disqualifying employment." D.
Br. 20.

"An administrator's decision to deny benefits must be based on
evidence, even if disputable, that clearly supports the basis for
its denial." *Lain*, 279 F.3d at 342 (internal quotation marks
omitted).   In this case, the only basis offered in the
administrative record for denying Fralick's benefits is predicated
on an incorrect interpretation of the Plan.  The other arguments in
the Fund's briefing are not supported by record evidence, and they
appear to fall squarely within *Shadler*'s description of a situation
in which trial counsel attempted to shore up the administrator's
grounds for denial once the case moved to federal court.  *See*
*Schadler*, 147 F.3d at 396.   If there were some doubt about the
Plan's treatment of Fralick's employment with Brandt Electric, a
remand would be necessary, because this court cannot ignore the
primary role of the Fund under ERISA.  But where, as here, there is
"no concrete evidence [to] support[ ] the administrator's basis for
denying benefits," the court will not remand simply to "allow the
administrator another opportunity to make a record because each of
the parties must make its record before the case comes to federal
court." *Robinson*, 443 F.3d at 397 n.5 (internal quotation marks
omitted).

For these reasons, considering Fralick's motion for judgment
on the pleadings as one for summary judgment, the court grants the

motion.[13]   The Fund's motion for summary judgment is denied.

                              *      *      *

    Accordingly, converting Fralick's December 21, 2009 motion for
judgment on the pleadings into a motion for summary judgment, the
court grants the motion.   The court denies the Fund's December 21,
2009 motion for summary judgment.   The court grants in part and
denies in part Fralick's January 8, 2010 motion to strike, and it
grants in part and denies in part Fralick's January 26, 2010 motion
to strike.   Fralick is entitled to recover a lump-sum payment of
$89,182.00 ($2,623 per month x 34 months, from January 2007 to
October 2009), pre- and post-judgment interest, and cessation of
the Fund's attempts to collect the $31,476.00 distributed to him in
2006.   He is also entitled to dismissal with prejudice of the
Fund's counterclaim.   Fralick may apply for an award of attorney's
fees according to the procedures and time limits of Rule 54(d)(2).

    **SO ORDERED.**

    June 22, 2010.


                                  _____
                                  SIDNEY A. FITZWATER
                                  CHIEF JUDGE

_____

    [13]Because the court has granted Fralick's motion on other
grounds, it need not address his claim for promissory estoppel.

                              - 54 -